# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

THOMAS D. JENSEN,

     Plaintiff

v.

JAMES DZURENDA, et al.,

     Defendants

Case No.: 3:19-cv-00178-MMD-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 60

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' motion for summary judgment. (ECF Nos. 60, 60-1 to 60-17, 63-1 (errata)). Plaintiff filed a response. (ECF No. 66.) Defendants did not file a reply.

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 43.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*)

The court screened Plaintiff's complaint, and he subsequently filed an amended complaint pursuant to a stipulation. (ECF Nos. 3, 41, 43.) Various defendants and claims have been dismissed, and the claims remaining are: (1) retaliation, First Amendment Free Exercise and equal protection claims against Edmond Mason; (2) a retaliation claim against John

Cardella; and (3) retaliation, Eighth Amendment failure to protect and First Amendment legal mail claims against Victor Lobato. (*See* ECF Nos. 3, 22, 46, 49, 64, 65.)

Plaintiff alleges that Mason retaliated against him by having him fired from his job after Plaintiff filed a complaint against Mason for discrimination. Plaintiff further avers that to practice his Lakota religion and participate in the sweat ceremony he had to obtain a staff sponsor, but Mason dissuaded staff from becoming the Native American sponsor, and thus prevented Plaintiff from practicing his religion. Plaintiff's equal protection claim contends Mason did this because he did not like Native Americans or their religion.

Plaintiff alleges that Cardella retaliated by filing false charges against Plaintiff.

Plaintiff avers that Lobato retaliated against him by orchestrating an inmate attack on Plaintiff, and the inmate did attack Plaintiff, and Lobato witnessed the attack but did nothing to intervene. Finally, Plaintiff contends that in November of 2017, Lobato purposefully read Plaintiff's legal mail outside his presence and then routed it back to Plaintiff through the regular mail.

Defendants move for summary judgment, arguing: (1) they did not participate in any constitutional violation; (2) they did not retaliate against Plaintiff; (3) Mason did not violate Plaintiff's free exercise rights because there is no evidence he precluded Plaintiff from obtaining Native American sponsors; (4) Lobato did not violate his First Amendment legal mail rights because there is no evidence to support that Plaintiff's legal mail was opened outside his presence; (5) Lobato did not orchestrate an attack on Plaintiff or fail to take action when the attack occurred as he did not see the attack; (6) Mason did not treat Plaintiff differently than similarly situated inmates because all religious groups must have a sponsor to conduct religious

1  activities; (7) Defendants are entitled to qualified immunity; and (8) Plaintiff failed to exhaust

2  administrative remedies as to certain claims.

3  **II. LEGAL STANDARD**

4  The legal standard governing this motion is well settled: a party is entitled to summary

5  judgment when "the movant shows that there is no genuine issue as to any material fact and the

6  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

7  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

8  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

9  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

10  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

11  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

12  other hand, where reasonable minds could differ on the material facts at issue, summary

13  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

14  "The purpose of summary judgment is to avoid unnecessary trials when there is no

15  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

16  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

17  of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

18  U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

19  one party must prevail as a matter of law"). In considering a motion for summary judgment, all

20  reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

21  *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

22  *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

23  nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

1  477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

2  determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

3  *Anderson*, 477 U.S. at 249.

4  In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

5  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

6  come forward with evidence which would entitle it to a directed verdict if the evidence went

7  uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

8  the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

9  *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

10 omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

11 defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

12 an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

13 party cannot establish an element essential to that party's case on which that party will have the

14 burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

15 If the moving party satisfies its initial burden, the burden shifts to the opposing party to

16 establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

17 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

18 dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

19 be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

20 *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

21 (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

22 by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

23 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

4

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Exhaustion**

Defendants argue that Plaintiff failed to exhaust his retaliation claim against Cardella, as

well as his retaliation, failure to protect, and legal mail claims against Lobato.

**1. Exhaustion Standard**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought

with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his

administrative remedies irrespective of the forms of relief sought and offered through

administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant

must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v.

Bock*, 549 U.S. 199, 204, 216 (2007).

Once a defendant shows that the plaintiff did not exhaust available administrative

remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is

something in his particular case that made the existing and generally available administrative

remedies effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d

767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate

plaintiff did not meet his burden when he failed to identify any actions prison staff took that

impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to

comply with the administrative remedies process)). The ultimate burden of proof, however, remains with the defendant. *Id*.

Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

In *Ross v. Blake*, the Supreme Court noted three instances where administrative procedures were unavailable: First, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." For example, if a handbook directs inmates to submit grievances to a particular administrative office, but in practice it disclaims the capacity to consider those petitions. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." This occurs, for example, "[w]hen rules are 'so confusing that … no reasonable prisoner can use them[.]'" Third, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." *Ross v. Blake*, 578 U.S. 632, 643-44 (2016).

1    The Ninth Circuit characterized this as a "non-exhaustive" list. *Andres v. Marshall*, 867

2  F.3d 1076, 1078 (9th Cir. 2017), as amended August 7, 2017.

3    **2. Cardella**

4    Cardella argues that Plaintiff never filed a grievance about filing false charges against

5  him, citing Plaintiff's grievance history report. (ECF No. 60-9.)

6    In his response, Plaintiff asserts that he did file a grievance against Cardella on

7  July 13, 2017, but prison officials refused to accept the grievance, and when he kited his

8  caseworker about it, she did not respond.

9    Plaintiff provides a copy of an informal level grievance dated July 13, 2017, where

10  Plaintiff states that on June 26, 2017, Cardella falsified an incident report against Plaintiff

11  claiming that Plaintiff made a fist at inmate Beard. Plaintiff claimed Cardella was trying to get

12  Plaintiff removed from the unit because Cardella had been targeting minorities. Plaintiff also

13  mentioned another inmate trying to start a fight with him on July 5, 2017, which Cardella

14  laughed at and ignored. Plaintiff believed that staff put the inmate up to it to make it look like

15  Plaintiff was getting into fights in the unit. Plaintiff reported the latter incident to Mason, who

16  did nothing. Plaintiff told another NDOC employee, Bell, about Cardella making the false report.

17  Plaintiff asked that he be given the false notice of charges, that the matter be turned over to the

18  Inspector General for investigation, and that his administrative claim be resolved. The grievance

19  was marked "not accepted." (ECF No. 66-1 at 13-19.)

20    Plaintiff sent an inmate request form (known as a "kite") to Caseworker Moyle on August

21  9, 2018, advising that his grievance had been returned as "not accepted" on the basis that it

22  contained more than one issue. Plaintiff explained that he was asserting a conspiracy, and in

23  order to make this claim he had to describe the events that formed the conspiracy. He argued that

7

if he submitted multiple grievances on each person involved in the conspiracy, the grievances would be rejected for filing multiple grievances on the same issue. Plaintiff asked how he should resolve the issue. There is no response to the kite. (ECF No. 66-1 at 25.)

Plaintiff has provided evidence that the grievance process was unavailable to him, and Defendants did not provide any rebuttal to satisfy their ultimate burden of proof that Plaintiff failed to exhaust administrative remedies. Therefore, Defendants' motion should be denied insofar as they argue that Plaintiff failed to exhaust administrative remedies as to the retaliation claim against Cardella.

**3. Lobato**

**a. First Amendment Legal Mail**

Lobato argues that Plaintiff did exhaust administrative remedies as to this claim because he did not make it beyond the informal level of his grievance.

On November 7, 2017, Plaintiff filed grievance 20063057560 at the informal level regarding the legal mail claim. (ECF No. 60-8 at 5, 7.) There is an improper grievance memo dated November 22, 2017, advising Plaintiff that he was required to attach any supporting documents for his claim, including the envelope which was the basis of his grievance. (*Id*. at 6.) The memo instructed Plaintiff to correct the deficiency and re-submit the grievance at the same level. (*Id*.) Plaintiff re-submitted the informal level grievance on March 25, 2018, stating that the envelope/letter was sent to the FBI office as evidence of a federal crime and violation of AR 250. (ECF No. 60-8 at 4.) There is another improper grievance memo dated May 17, 2018, which again advises Plaintiff to attach the supporting envelope. (*Id*. at 2.)

Again, there is evidence that the grievance process was unavailable to Plaintiff.  He was instructed to submit the supporting documentation for his claim (the legal mail), but Plaintiff

asserted that he could not do so because he had sent the documents and envelope to the FBI as evidence. As with Cardella, Defendants did not rebut the evidence that administrative remedies were not available to Plaintiff. Therefore, Defendants' motion for summary judgment should be denied insofar as they argue Plaintiff failed to exhaust his administrative remedies as to the First Amendment legal mail claim against Lobato.

### b. Retaliation and Failure to Protect

Lobato also argues that Plaintiff did not exhaust administrative remedies as to the retaliation or failure to protect claims because he did not proceed past the first level of his grievance.

Plaintiff filed grievance 20063058311, asserting he was assaulted on November 29, 2017, and the guards watched the attack but did nothing to intervene. (ECF No. 60-12 at 3, 8-10.) The informal response partially granted the grievance and said it would be forwarded to the Inspector General's Office. (*Id.* at 7.)

Plaintiff filed a first level grievance, stating that Ward told him he had to wait 90 days from the date he signed the informal response, for a response from the Inspector General's Office. Ward told him there had not been a response within the 90 days, and instructed Plaintiff to proceed with his first level grievance. In the first level grievance, Plaintiff asserted Peters and Lobato stood by and watched the assault. (*Id*. at 5-6.) The first level response states: "3098: AR 740.03.6. An inmate who is dissatisfied with the response to a grievance at any level may appeal the grievance to the next level, within the substantive and procedural requirements outlined herein, *unless the action requested has already been Granted or Partially Granted at a lower level*." (*Id*. at 4, emphasis added.)

Defendants argue that Plaintiff failed to exhaust his administrative remedies even though it is clear that he was precluded from proceeding further with the grievance by prison officials. When Plaintiff tried to proceed to the first level, he was told he need not do so because his grievance had been partially granted at the lower level.

Moreover, as Plaintiff points out, he did not receive a response from the Inspector General's Office until after he filed this lawsuit and Magistrate Judge William Cobb ordered the Attorney General's Office to obtain a response for Plaintiff from the Inspector General. (*See* ECF No. 38; Inspector General's June 25, 2021 response at ECF No. 60-14.) To the extent Defendants are arguing that Plaintiff had to wait (apparently indefinitely) for the Inspector General's response before filing his lawsuit, the Ninth Circuit has held that "[w]hen prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies" because "prison officials have thwart[ed] inmates from taking advantage of [the] grievance process, making that process unavailable." *Andres,* 867 F.3d at 1079 (internal quotation marks and citations omitted).

Notably, Magistrate Judge William Cobb (now retired) previously found administrative remedies are unavailable in scenarios analogous to this: where the inmate is told at the informal level that his claim is being referred to the Inspector General, but then the Inspector General's investigation goes on indefinitely or is never initiated and the inmate does not receive a response. *See* No. 3:16-cv-00553-MMD-WGC, 2018 WL 6594608, at *3-4 (D. Nev. Nov. 26, 2018), report and recommendation adopted in 2018 WL 6591796 (D. Nev. Dec. 14, 2018); *Lafferty v. Williams*, No. 3:16-cv-00279-RCJ-WGC, 2017 WL 8217698, at *7-8 (D. Nev. Dec. 6, 2017), report and recommendation adopted in 2018 WL 1245500 (D. Nev. Mar. 9, 2018).

1    In sum, Defendants' motion should be denied insofar as they argue Plaintiff failed to

2  exhaust administrative remedies as to the retaliation and failure to protect claims against Lobato.

3  **B. Mason**

4     **1. Free Exercise Clause**

5    "The First Amendment, applicable to state action by incorporation through the Fourteenth

6  Amendment...prohibits government from making a law prohibiting the free exercise [of

7  religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)

8  (citations and quotation marks omitted, alteration original). "The right to exercise religious

9  practices and beliefs does not terminate at the prison door. The free exercise right, however, is

10  necessarily limited by the fact of incarceration, and may be curtailed in order to achieve

11  legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196,

12  197 (9th Cir. 1987) (per curiam); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

13  (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Hartmann v. Cal. Dept. of Corr. and Rehab.*,

14  707 F.3d 1114, 1122 (9th Cir. 2013); *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

15    To implicate the Free Exercise Clause, a prisoner must first establish his belief is both

16  sincerely held and rooted in religious belief. *See Shakur*, 514 F.3d at 884-85. "The Free Exercise

17  Clause does not require plaintiffs to prove the centrality or consistency of their religious practice:

18  'It is not within the judicial ken to question the centrality of particular beliefs or practices to a

19  faith.'" *Jones v. Slade,* 23 F.4th 1124, 1145 (9th Cir. 2022) (quoting *Hernandez v. Comm'r of*

20  *Internal Revenue*, 490 U.S. 680, 689 (1989)). The test is whether the plaintiff sincerely believes

21  the conduct at issue is consistent with his faith. *Id*. (citation omitted).

22    Next, "a person asserting a free exercise claim must show that the government action in

23  question substantially burdens the person's practice of her religion." *Jones v. Williams,* 791 F.3d

1023, 1032 (9th Cir. 2015) (citing *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987), *aff'd sub nom. Hernandez*, 490 U.S. at 699).

"Once a claimant demonstrates that the challenged regulation impinges on his sincerely held religious exercise, the burden shifts to the government to show that the regulation is 'reasonably related to legitimate penological interests.'" *Jones,* 23 F.4th at 1144 (quoting *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015)).

In analyzing the legitimacy of regulation of a prisoner's religious expression, the court is instructed to utilize the "reasonableness" factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987). *See O'Lone*, 482 U.S. at 349; *Jones*, 791 F.3d 1032; *Shakur*, 514 F.3d at 884. The *Turner* factors are: (1) is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and "the existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91; *see also O'Lone*, 482 U.S. at 349.

Mason does not argue Plaintiff lacks a sincerely held religious belief in participating in the Native American sweat lodge. Instead, Mason appears to argue that he did not substantially burden Plaintiff's free exercise of his religion because there is no evidence he dissuaded other staff members from becoming the Native American sponsor.

It is undisputed that Mason volunteered as the staff Native American sponsor for three years, and then ceased volunteering as such. Plaintiff takes issue with the reason why Mason

ceased doing so, but that is not material to whether Mason dissuaded other staff members from volunteering to be the Native American sponsor.

Plaintiff tried to get a staff member named Carvoth to sponsor the Native American inmates, but Mason told Carvoth things to dissuade him from doing so. (ECF No. 66 at 16 ¶ 4.) In dissuading other staff members from becoming the Native American sponsor, Plaintiff contends that it interfered with his right to participate in the sweat lodge because without a sponsor, the Native Americans could not get firewood for the sweat lodge. Mason's declaration states that he stopped volunteering as the Native American sponsor, but he does *not* specifically rebut that he dissuaded others from becoming the sponsor.

Mason appears to argue that he did not burden Plaintiff's religious practice related to lack of access to firewood. Mason's declaration states that it is his understanding that all religious firewood is donated by an outside sponsor and this person donates the firewood to the Stewart Camp, and if wood is available, the donated wood can be brought into the institution by a sponsor, an institution chaplain and/or a search and escort officer. (Mason Decl., ECF No. 60-3 at 3 ¶¶ 7-8.) This does not address any specific policy or practice of the donation and/or use of firewood for the Native American sweat lodge at *NNCC*.

In sum, the court finds a genuine dispute of material fact exists as to whether Mason substantially burdened Plaintiff's access to the sweat lodge and summary judgment should be denied as to Plaintiff's First Amendment Free Exercise Clause claim.

**2. Equal Protection Clause**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To prevail on an Equal Protection claim under

13

§ 1983, the plaintiff must establish that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." *Hartmann,* 707 F.3d at 1123 (quotation marks and citation omitted).

"[T]he Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur,* 514 F.3d at 891 (quoting *Cruz,* 405 U.S. at 322). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Hartmann*, 707 F.3d at 1123 (citing *Cruz*, 405 U.S. at 322 n. 2.; *Ward*, 1 F.3d at 880; *Allen v. Toombs*, 827 F.2d 563, 568-69 (9th Cir. 1987)).

Plaintiff filed grievance 20063048947 on May 23, 2017. He asserted that on May 19, 2017, Mason said in front of other inmates that all Native American inmates at NNCC were "foul" and "dirty." Mason yelled racist and derogatory comments directed toward Plaintiff's race and religion. Mason also told Plaintiff that any grievance filed against him would not go anywhere and any inmate that complains or grieves him would be removed from NNCC and lose their job and property. (ECF No. 60-2 at 3, 12-14.)

The response states: "[P]er your conversation with Lt. Bell you stated that C/O Mason has been professional when working with the yard labor crew, and that you feel this grievance has been resolved." (*Id*. at 2.)

Plaintiff filed a first level grievance stating that the response to the informal level grievance was misleading and it took Plaintiff's statement (to Bell) out of context. Plaintiff clarified that his grievance was addressing discrimination against him and other Native Americans at NNCC, and was not about the yard labor crew. (*Id*. at 9, 19.) The first level response states that Mason responded that he previously had been the staff sponsor for the Native

14

1  Americans and made the decision to cease doing so because too many Native Americans had

2  "come up dirty," meaning inmates tested positive for prison-made alcohol and narcotics. The

3  grievance was denied, finding no evidence Mason made any discriminatory remarks. (*Id*.)

4       At the second level, Plaintiff disagreed with the response and said he never "came up

5  dirty" on any tests in 20 years at NDOC. (*Id*. at 5, 6-7.) The second level response reiterates the

6  response to the first level. (*Id*. at 4.)

7       Plaintiff alleges that Mason inhibited Plaintiff's ability to find a sponsor for his Native

8  American religion because Mason did not like Native Americans or their religion.

9       Mason argues there is no evidence that he dissuaded other staff from volunteering as the

10 Native American sponsor. He further contends there is no evidence he does not like Native

11 Americans. He points out that he served as the Native American sponsor for three years, until he

12 quit because the Native American population was violating NDOC policies when they were

13 caught intoxicated and fighting. (Mason Decl., ECF No. 63-1 at 3 ¶¶ 5, 9-11.) Mason also denies

14 making any racist or derogatory statements. (*Id*. ¶ 12.) Mason asserts that Plaintiff was not

15 treated differently than any other Native American inmates, as they were allowed to practice

16 their religion other than participating in the sweat ceremony, and all religions have to get a

17 sponsor.

18      The court finds there are various disputed material facts that require denial of Mason's

19 motion for summary judgment as to the equal protection claim. First, there is a dispute as to

20 whether Mason discriminated against Plaintiff based on his being Native American. Mason

21 maintains that when he said "dirty," he was referring to Native Americans testing positive for

22 prison-made alcohol or narcotics. Elsewhere he mentions that they had violated institutional

23 policies or were caught fighting. Plaintiff, on the other hand, is adamant that Mason called him,

as a Native American, and his religion, "dirty" and "foul." Plaintiff asserts the term "dirty" has been used against Native Americans for more than 100 years, and Mason used those terms in a racist and derogatory manner. (Pl. Decl., ECF No. 66 at 16 ¶ 1.)

Next, as was pointed out above, there is an additional dispute as to whether Mason engaged in the discriminatory conduct of dissuading others from volunteering as the Native American sponsor. Finally, there is a dispute as to whether this had an impact on Plaintiff's ability to practice his religion (*i.e.*, obtain firewood for the Native American sweat lodge).

As such, Mason's motion for summary judgment should be denied as to Plaintiff's equal protection claim.

### 3. Retaliation

Plaintiff alleges Mason retaliated against him by having Plaintiff fired from his job.

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

Plaintiff filed grievance 20063050920 at the informal level on June 22, 2017, asserting that Mason gave false and misleading information to Prison Industries on May 22, 2017, by falsely stating that Plaintiff had been involved in a fight. As a result of Mason's false statement, Plaintiff's employment was terminated. Plaintiff claims this was done in retaliation for Plaintiff making a formal complaint against Mason about racial/religious discrimination. (ECF No. 60-5 at 17-18.) The response to the informal level grievance states that Ms. Byington (from Prison Industries) actually reported that Mason had recommended Plaintiff to work in Prison Industries. In addition, a person named Matt Brown was considering hiring Plaintiff, but Mr. Bill Quenga did not approve hiring Plaintiff. Ms. Byington was going to hire Plaintiff, but said she was told by one of her workers in the bindery that Plaintiff was involved in a fight, so she took him off her list. As such, Plaintiff was never hired in Prison Industries. (*Id*. at 16.)

In his first level grievance, Plaintiff disputed the version of events set forth in the informal level response. Plaintiff claimed that Mason never recommended that he work in Prison Industries. Instead, Plaintiff applied to work in the finish shop because inmates in that department had asked him to do so. Mason came to sit in on Plaintiff's interview and had Mr. Quenga ask if Plaintiff was a Native American, and then asked if Plaintiff drank and said all Native Americans are drunks. Nevertheless Mr. Brown agreed to hire Plaintiff. Ms. Byington then asked Plaintiff if he would work for her, and Plaintiff told her he would have to ask Mr. Brown. Mr. Brown said Ms. Byington could hire Plaintiff. Plaintiff maintained he was never in a fight, and it was Mason who told this story to Prison Industries, which was why he was not allowed to work there. (*Id*. at 21-23.)

The first level response repeated that Mason was present during the interview because he was recommending Plaintiff for the position. The response acknowledges that Plaintiff was

placed on the shop list, but advised that being placed on the approved list does not guarantee the assignment. In June 2017, Ms. Byington needed workers and Plaintiff was referred, but Plaintiff received an "OIC" on June 20, 2017, for a MJ 25 threat, which was later reduced to G6 for fighting. As such, Plaintiff was not considered for placement in the book bindery and was suspended from the list. (*Id*. at 9.)

Plaintiff submitted a second level grievance, stating that the MJ 25 happened in June of **2016,** not in 2017. (*Id*. at 6-7.) The second level response reiterates the first level response, but adds that a review of NOTIS reflects that the OIC was dismissed. (*Id*. at 2.)

According to Mason, in 2017, Plaintiff was an inmate worker with yard labor under Mason's supervision. (Mason Decl., ECF No. 63-1 at 3 ¶ 13.) In May of 2017, Plaintiff applied to work within Prison Industries. (*Id*. ¶ 14.) Mason escorted Plaintiff to his first interview and sat in on the interview to give a recommendation for the position; however, the position was filled by another worker. (*Id*. ¶¶ 15-16.) In June of 2017, Plaintiff had a second interview for a different position in the bindery shop. (*Id*. ¶ 17.) Plaintiff had been considered for the position, but he was found to have been involved in "the Unit 10 altercation" and was given a notice of charges. To work in Prison Industries, an inmate has to have 90 days of no misconduct, and Mason says this is why Plaintiff did not get the second position in Prison Industries. (*Id*. at 4 ¶¶ 18-20.)

Plaintiff's inmate disciplinary report shows there was a *dismissed* G6 charge for fighting on June 28, 2017, but the last guilty finding of fighting is from June 20, 2016. (ECF No. 60-15 at 2.) Plaintiff sent a kite on May 23, 2017, to the Unit 10 caseworker, Buchanan, asking whether there were any disciplinary reports in the last 60 days. Buchanan confirmed there was nothing on Plaintiff's record, and his last "OIC" was on June 20, 2016, for the G6 charge of fighting. (ECF

No. 66 at 92.) Plaintiff sent another kite to Mr. Shreckengost on May 24, 2017, claiming that Mason had begun a campaign to drive him off the yard because Plaintiff had made a formal complaint against him. He asserted that Mason had gone to Prison Industries and told them not to hire Plaintiff. (ECF No. 66-1 at 2.)

Plaintiff argues that it was not until he filed the grievance against Mason for racism that Mason made up the story that Plaintiff had been in a fight, which resulted in his not getting a job in Prison Industries. (Pl. Decl., ECF No. 66 at 16 ¶ 2.)

First, there is a genuine dispute between the parties as to whether Mason took adverse action against Plaintiff, *i.e.*, whether he told Prison Industries that Plaintiff was involved in a fight so Plaintiff would not be considered for employment. There is also a dispute as to whether Plaintiff was involved in any fight in June of 2017. Defendants point to the charges filed by Cardella, but as will be discussed further below, Plaintiff disputes that charge, and the charge was ultimately dismissed.

Assuming Mason did tell Prison Industries Plaintiff had been involved in a fight, Plaintiff also raises a genuine dispute as to whether Mason did this because of Plaintiff's protected conduct: filing the grievance against Mason for discrimination. Circumstantial evidence of retaliatory motive may include proximity in time between the protected speech and the alleged retaliation. *Brodheim v. Cry,* 584 F.3d 1262, 1271 (9th Cir. 2009) (citation omitted). Plaintiff's complaint about Mason discriminating against him and the interviews with prison industries took place in close proximity to each other. Moreover, when Plaintiff filed his grievance against Mason for discrimination, he specifically claimed that Mason told him that any inmate that complains or grieves him will be removed from NNCC and will lose their *job* and their property.

1   As such, Mason's motion for summary judgment should also be denied as to the

2   retaliation claim.

3   **C. Cardella**

4   Plaintiff alleges that Cardella retaliated against him by bringing false charges against

5   Plaintiff.

6   There is a notice of charges for fighting brought by Officer Cardella. Cardella's report

7   asserts that on June 26, 2017, Cardella was posted in Unit 10-B and observed Plaintiff engaged

8   in a verbal altercation with another inmate. Plaintiff was challenging the other inmate to follow

9   Plaintiff to the bathroom to fight. Plaintiff raised his fist threatening to strike the other inmate.

10  Cardella approached to try to get the inmates to calm down. Plaintiff told Cardella that he was

11  being disrespected and was going to teach the other inmate a lesson. Cardella told Plaintiff any

12  violence would result in him being locked up. Plaintiff said he did not care, and people better not

13  disrespect him. (ECF No. 60-5.) The charge was ultimately dismissed. (ECF No. 60-6.)

14  Cardella argues there is no evidence that he filed false charges against Plaintiff; instead,

15  Cardella reported what he observed.

16  Plaintiff, on the other hand, asserts that he submitted a grievance about discriminatory

17  retaliation by Mason on June 22, 2017, and on June 28, 2017, Cardella filed the false notice of

18  charges against him for the alleged fight on June 26, 2017. Plaintiff claims that this was done in

19  retaliation for the grievance against Mason, and in concert with Mason, to make it appear that

20  Plaintiff was in a fight so there would be justification for Plaintiff not getting the job in Prison

21  Industries.

22

23

20

1    While the parties dispute whether the charges against Plaintiff for the incident on June

2  26, 2017, were false, even assuming they were, there is no evidence in the record to demonstrate

3  that Cardella levied the charges against Plaintiff *because of* any protected conduct.

4    Plaintiff argues that *Cardella* falsified the charges because Plaintiff had filed a grievance

5  against *Mason* and that Mason and Cardella were acting in concert, but there is *no evidence* to

6  support this conjecture of a connection between Mason's and Cardella's conduct. A plaintiff's

7  mere speculation that there is a causal connection is not enough to raise a genuine dispute of

8  material fact. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations omitted)

9  (affirming grant of summary judgment where there was no evidence that defendants knew about

10  plaintiff's prior lawsuit, or that defendant's disparaging remarks were made in reference to the

11  prior lawsuit). Here, there is no evidence that Cardella knew about the grievance against Mason,

12  and no actual evidence that Mason and Cardella were working in concert against Plaintiff.

13    Therefore, the motion for summary judgment should be granted as to the retaliation claim

14  against Cardella.

15  **D. Lobato**

16    **1. Retaliation and Failure to Protect**

17    Under the Eighth Amendment, prison conditions should not "involve the wanton and

18  unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime

19  warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison

20  conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates

21  receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

22  guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting

23  *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

"[P]rison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted); *see also Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir.2015) (citing *Farmer*, 511 U.S. at 833). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833  (internal citations omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 834 (citing *Rhodes*, 452 U.S. at 347).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *See Farmer*, 511 U.S. at 834; *Labatad*, 714 F.3d at 1160.

First, "the deprivation alleged must be, objectively, sufficiently serious...; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Farmer*, 511 U.S. at 834  (citations and quotations omitted).  When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id*.  (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

Plaintiff filed grievance 20063058311, stating that on November 29, 2017, he was assaulted. Plaintiff said that he saw Correctional Officer Peters at the end of the hallway watching, and Plaintiff walked down the hall and Peters and Lobato were standing outside of the control room in the rotunda. Plaintiff stated that the inmate who attacked him had come to his cell later and told Plaintiff that officers told him to assault Plaintiff and they would make sure nothing happened. Plaintiff alleged that the guards watched the attack, but did nothing to intervene. (ECF No. 60-12 at 3.) In his first level grievance, Plaintiff reiterated that Peters and Lobato stood by and watched the assault. (*Id*. at 5-6.)

Defendants' motion admits that the attack on Plaintiff was planned, but Lobato maintains that he did not witness the assault, and it was only brought to his attention the following day. (Lobato Decl., ECF No. 60-16 at 3 ¶¶ 5, 7.) The video shows Plaintiff being assaulted by the other inmate, but it does not depict, one way or the other, whether there are correctional officers down the hallway that witnessed the assault. The video shows people at the end of the hallway during the assault, but it is unclear whether they are inmates or staff.

On the other hand, Plaintiff's grievance, filed the day after the assault, claims that Peters and Lobato witnessed the incident. Plaintiff reiterates this in his declaration. (ECF No. 66 at 16 ¶ 10.) Plaintiff also provides the declaration of inmate Burgess, who identifies himself as the inmate in the video who comes out of his cell and helps Plaintiff up. Burgess states that when he went out of his cell into the hallway and saw Plaintiff being assaulted, he noticed officers who

1 either turned their heads or looked to the floor, but did nothing to stop the assault and said

2 nothing. (ECF No. 66-1 at 52.)

3       There is a genuine dispute of material fact as to whether Lobato witnessed the assault and

4 failed to intervene to protect Plaintiff. Therefore, the motion for summary judgment should be

5 denied as to the Eighth Amendment failure to protect claim against Lobato.

6       With respect to the retaliation claim, Lobato states he has never prompted an attack on

7 any inmate. (ECF No. 60-16 ¶ 9.) The only evidence Plaintiff offers in response is a statement

8 from the inmate who assaulted him that unidentified officers told him to assault Plaintiff.

9 The statement from the aggressor inmate is inadmissible hearsay. Plaintiff does not provide any

10 other evidence to support his claim that Lobato orchestrated the attack against him in retaliation

11 for filing grievances. Therefore, summary judgment should be granted as to the retaliation claim

12 against Lobato.

13     **2. First Amendment Legal Mail**

14       The Ninth Circuit has held that the First Amendment protects an inmate's right to be

15 present when his civil legal mail is opened. *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1211 (9th

16 Cir. 2017).

17       On November 7, 2017, Plaintiff filed a grievance (20063057560) stating that he received

18 legal mail from an attorney at the ACLU on October 30, 2017, regarding case 3:16-cv-00407-

19 MMD-VPC. Plaintiff claimed that the legal mail had been opened prior to his receiving it and

20 was delivered as "personal mail." He cited AR 250, which requires legal mail from attorneys to

21 be opened in front of the inmate and the inmate must sign the legal mail log. (ECF No. 60-8 at 5,

22 7.)

23

1    Plaintiff did not attach any supporting documentation to the grievance; therefore, Lobato

2    contends Plaintiff cannot prove there is evidence that this incident occurred.

3    Plaintiff states in his declaration that Lobato opened his legal mail outside of his

4    presence. (ECF No. 66 at 16 ¶ 9.)

5    Lobato does not argue that he did not open Plaintiff's legal mail outside of Plaintiff's

6    presence. Instead, he claims Plaintiff has no evidence to support this claim. While Plaintiff may

7    not have the envelope and documentation itself because he sent it to the FBI as evidence, his own

8    declaration asserts that Lobato opened his legal mail when Plaintiff was not present. This is

9    sufficient to create a genuine dispute of material fact to defeat Lobato's motion for summary

10   judgment.

11   In sum, Lobato's motion for summary judgment should be denied as to the First

12   Amendment legal mail claim.

13   **E. Qualified Immunity**

14   Defendants argue they are entitled to qualified immunity because they did not violate any

15   constitutional right, and to the extent the court concludes otherwise, such right was not clearly

16   established.

17   "In evaluating a grant of qualified immunity, a court considers whether (1) the state

18   actor's conduct violated a constitutional right and (2) the right was clearly established at the time

19   of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021)

20   (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*,

21   555 U.S. 223 (2009)).

22

23

With respect to the claims that the court is recommending proceed, when the facts are viewed in the light most favorable to Plaintiff, a fact finder could determine that Plaintiff's constitutional rights were violated.

Moreover, the authority cited above demonstrates it was clearly established that an official who substantially burdens a Plaintiff's religious exercise when the reason for doing so is not reasonably related to a legitimate government interest violates the Free Exercise Clause; an official who acts with an intent or purpose to discriminate against an inmate based on his membership in a protected class violates the Equal Protection Clause; an official that knows of and disregards a risk to an inmate's safety violates the Eighth Amendment; an official who opens legal mail outside the inmate's presence violates the First Amendment; and, there is a constitutional right to pursue grievances without being retaliated against.

Therefore, Defendants are not entitled to qualified immunity.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No. 60) as follows:

(1) The motion should be **DENIED** insofar as Defendants argue that Plaintiff failed to exhaust administrative remedies; that they are entitled to qualified immunity; as to the First Amendment Free Exercise Clause, Equal Protection clause and retaliation claims against Mason; as to the Eighth Amendment failure to protect and First Amendment legal mail claims against Lobato.

(2) The motion should be **GRANTED** as to the retaliation claims against Cardella and Lobato.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: August 29, 2022

_____
Craig S. Denney
United States Magistrate Judge